## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SMP
1032 13th St NW, Suite 247
Washington, DC 20005,

               Plaintiff,

       v.

FEDERAL ELECTION COMMISSION
1050 First Street NE
Washington, DC 20463,

              Defendant.

Civil Action No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      On August 13, 2025, Plaintiff Senate Majority PAC ("SMP") filed an administrative complaint with the Federal Election Commission (the "FEC" or "Commission"), alleging that the National Republican Senatorial Committee ("NRSC") violated the Federal Election Campaign Act of 1971, as amended ( "FECA"), by impermissibly using funds from the NRSC's "legal proceedings" and "headquarters" accounts (collectively, "specialty accounts") to pay for candidate television advertisements.

2.      To SMP's knowledge, the Commission has not taken any action on SMP's complaint in the 176 days since SMP filed it. SMP therefore brings this action under 52 U.S.C. § 30109(a)(8)(A), because SMP is aggrieved by the Commission's failure to act on its complaint within 120 days after SMP filed it. SMP seeks a declaration that the Commission's failure to act is contrary to law, and an order directing the Commission to conform with that declaration within 30 days. 52 U.S.C. § 30109(a)(8)(C). If the Commission fails to do so, SMP will be entitled to

bring a civil action in its own name to remedy the NRSC's violation of FECA. 52 U.S.C. § 30109(a)(8)(C).

3.      At issue is a straightforward violation of FECA's contribution limits. FECA generally limits the NRSC to raising $44,300 per year from any single donor. *See* 52 U.S.C. § 30116(a)(1)(B); FEC, Price Index Adjustments for Contribution & Expenditure Limitations, 90 Fed. R. 8526, 8528 (Jan. 30, 2025) (inflation adjustment). However, FECA imposes a higher annual limit of $132,900 per donor for contributions to separate specialty accounts that may be used "*solely to defray expenses incurred* with respect to . . . headquarters buildings of the party" or with respect to "the preparation for and conduct of election recounts and contests and other legal proceedings." 52 U.S.C. § 30116(a)(9) (emphasis added); *see id.* § 30116(a)(1)(B). These specialty accounts cannot be used for television advertising or campaign advertising.

4.      In the 2024 election cycle, the NRSC violated these restrictions by spending at least $4.8 million in specialty account funds on candidate television advertisements. The NRSC did so by creating sham "joint fundraising committees" that were purportedly established to jointly raise money for Republican Senate candidates and for the NRSC's specialty accounts. In fact, however, these sham joint fundraising committees distributed almost nothing to the committees they were purportedly raising money for.

5.      Instead, the NRSC's sham joint fundraising committees spent the vast majority of their funds on television advertisements that were nearly indistinguishable from ordinary candidate campaign advertisements, which the NRSC mischaracterized as fundraising expenses. By doing so, the NRSC spent millions of dollars that should have been restricted to funding legal proceedings or headquarters expenses on campaign advertisements for which specialty account funds may not lawfully be used.

6.    The NRSC has never acknowledged that its use of sham joint fundraising committees in the 2024 election was unlawful, nor disclaimed its intent to use them again in the future. As fundraising and campaign activities for the 2026 U.S. Senate elections accelerate, SMP the NRSC is already engaging in the same unlawful behavior in connection with at least one advertisement being run in Texas. And SMP has every reason to expect that the NRSC will engage in this same unlawful behavior in even more states if enforcement action is not taken against it.

7.    Plaintiff therefore requests that the Court declare the FEC's failure to act on its complaint within 120 days is contrary to law and order the FEC to conform with that declaration within 30 days. *See* 52 U.S.C. § 30109(a)(8)(A). If the FEC does not do so, Plaintiff will commence a civil action, naming the NRSC as the defendant, to remedy the violations cited in the original complaint. *See id.* § 30109(a)(8)(C).

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1331.

9.    Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A).

## THE PARTIES

10.    Plaintiff SMP is an FEC-registered independent expenditure–only committee, colloquially known as a "Super PAC."

11.    SMP's singular mission is to elect Democrats to the United States Senate. During the 2023–2024 election cycle, SMP made over $350 million in disbursements in furtherance of its mission. SMP is continuing its work for the 2026 election cycle, when it will once again spend millions of dollars in independent expenditures to elect Democratic Senate candidates and defeat Republican Senate candidates.

12.     With 35 Senate elections in 2026, at least 10 of which are expected to be competitive enough to attract significant spending, SMP must constantly update its fundraising and expenditure strategy throughout the election cycle to allocate its funds to the elections in which they are needed most. In doing so, SMP expends significant resources carefully monitoring fundraising and expenditures by groups who support Republican candidates, including the NRSC. Accurate, timely FEC reporting is critical to SMP's ability to engage in that monitoring, and therefore to adjust its own fundraising and expenditure strategy to ensure it is supporting Democratic Senate candidates where they most need SMP's support. For example, an increase in the NRSC's ad spending in Wisconsin might lead SMP to shift additional resources to that state to counteract those ads.

13.     The NRSC's use of sham joint fundraising committees to raise and spend money from the NRSC's specialty accounts on campaign advertisements in competitive Senate races has the effect of obscuring and disguising the NRSC's fundraising and expenditures in its FEC reporting, materially harming SMP's ability to accurately and timely monitor the NRSC's fundraising and spending. In that scenario, SMP cannot make an informed decision of where and how to spend money, including which messages it chooses to convey, where.

14.     In addition, because SMP exists to elect Democratic candidates, the NRSC's unlawful use of funds raised for specialty accounts to instead fund campaign advertising represents a competitive harm to SMP, which suffers a disadvantage in achieving its mission. The NRSC and SMP are in direct competition with each other: the NRSC exists to support Republican Senate candidates and win a Republican majority in the Senate, while SMP exists to support Democratic Senate candidates and win a Democratic majority in the Senate.

15.     Defendant FEC is an independent federal agency charged with the administration and civil enforcement of FECA. 52 U.S.C. § 30106(b).

## LEGAL BACKGROUND

16.     FECA generally limits committees established by national party committees, including the NRSC, to accepting $44,300 per year in contributions from any single donor. *See* 52 U.S.C. § 30116(a)(1)(B); FEC, Price Index Adjustments for Contribution & Expenditure Limitations, 90 Fed. R. 8526, 8528 (Jan. 30, 2025) (inflation adjustment). Committees may spend funds raised subject to this limit for any lawful purpose, including on television advertisements in support of political candidates.

17.     FECA imposes higher contribution limits of $132,900 each for contributions to two specialty accounts that the NRSC is eligible to establish. *See* 52 U.S.C. § 30116(a)(9) *see id.* § 30116(a)(1)(B); FEC, Price Index Adjustments for Contribution & Expenditure Limitations, 90 Fed. R. 8526, 8528 (Jan. 30, 2025) (inflation adjustment). However, the Act sharply restricts how contributions to these specialty accounts may be used.

18.     The first such specialty account—the headquarters account—may be "used solely to defray expenses incurred with respect to the construction, purchase, renovation, operation, and furnishing of one or more headquarters buildings of the party." 52 U.S.C. § 30116(a)(9)(B).

19.     The second such specialty account—the legal proceedings account—may be "used solely to defray expenses incurred respect to the preparation for and the conduct of election recounts and contests and other legal proceedings." *Id.* § 30116(a)(9)(C).

20.     Neither specialty account may be used to pay for advertisements or other communications in support of candidates. Nor may funds from either specialty account be transferred to a committee's general account and spent for that or any other unauthorized purpose.

Rather, each specialty account must be kept "separate" and "segregated" from general national party committee funds. *Id.* § 30116(a)(l)(B), (a)(9).

21.    National party committees must report all receipts into and disbursements from their general accounts and specialty accounts. 52 U.S.C. § 30104; C.F.R. § 104.3.

22.    FECA also authorizes the establishment of "joint fundraising" committees through which candidates jointly solicit funds and share in the resulting proceeds. *See* 52 U.S.C. § 30102(e)(3)(A)(ii). An FEC regulation provides that other political committees may engage in joint fundraising as well. *See* 11 C.F.R. § 102.17.

23.    Joint fundraising committees may accept individual contributions up to "the total amount that the contributor could contribute to all of the participants" in the committee. *Id.* § 102.17(c)(5). They then must "allocate . . . proceeds to the participants" in accordance with a written formula, subject to any changes requested by a contributor or required to avoid exceeding a contributor's contribution limit as to any participant. *Id.* § 102.17(c)(1), (c)(2)(i)(C), (c)(2)(1)(D). In particular, if a contributor had already made the maximum contribution to one of the participating committees, the portion of their contribution to the joint fundraising committee that would have been allocated to that committee must be returned to the contributor instead. *Id.* § 102.17(c)(6)(i), (ii).

24.    Joint fundraising committees must pay their own expenses before proceeds can be transferred to the participant committees, with each participant's share of expenses "based on the percentage of the total receipts each participant had been allocated." *Id.* § 102.17(c)(7)(i)(A). A participant must follow contribution limits when paying expenses on behalf of another participant. *Id.* § 102.17(c)(7)(i)(B). Once expenses are paid, a joint fundraising committee distributes net

proceeds to the participants. *Id.* § 102.17(c)(7)(i)(A). After distribution, each participant committee shall report its received share of net proceeds. *Id.* § 102.17(c)(8)(i)(B).

25.     Joint fundraising committees shall "report all funds received in the reporting period in which they are received," *Id.* § 102.17(c)(8)(i)(a), and report "all disbursements in the reporting period in which they are made." *Id.* § 102.17(c)(8)(ii)

## FACTUAL BACKGROUND

26.     In the months leading up to the 2024 United States Senate elections, the NRSC created three joint fundraising committees (the "sham JFCs") with the campaigns of three Republican Senate candidates: Mike Rogers in Michigan, Sam Brown in Nevada, and Eric Hovde in Wisconsin. The JFCs, named the Michigan Victory Committee ("MVC"), Nevada Victory Committee ("NVC") and Wisconsin Victory Committee ("WVC"), included the NRSC and the Senate campaign committee of the Republican nominee for Senate in each of those states.

27.     The sham JFCs raised millions of dollars that were designated for the NRSC's specialty accounts. Each sham JFC then spent substantially all the funds it raised disseminating multiple television advertisements that are materially indistinguishable from typical candidate advertisements. The advertisements, 16 of which are detailed in Exhibit A to the administrative complaint, follow a similar script: they advocate for the election of the Republican Senate candidate or oppose the election of the Democratic Senate candidate, display a QR code that links to the sham JFC's solicitation page, and include a general, oral solicitation to "give today" or "donate today."

28.     For example, one of the WVC's advertisements provided:

Tammy Baldwin doesn't share our Wisconsin values. Baldwin's life partner is a Wall Street executive who has invested in industries that Tammy oversees in Washington. But Senator Baldwin refuses to disclose her partner's financial assets. That's a conflict of interest. They're getting richer while you're paying more.

Tammy Baldwin's not on your side. She's in bed with Wall Street. I'm Eric Hovde and I approve this message. Join the team and give today.

29.     This advertisement is indistinguishable from a traditional candidate advertisement. It even features a voiceover from the candidate as well as text on the screen to state that the candidate, Eric Hovde, approved it. Hovde's campaign ran extremely similar advertisements using its own funds during the 2024 election.

30.     The advertisements run by the sham JFCs say nothing about the NRSC, much less about the NRSC's building or legal proceedings specialty accounts. The only thing that links them to the sham JFCs that paid for them is a briefly displayed QR code and link to the relevant sham JFC's website, along with a small print "paid for by" disclaimer naming the sham JFC.

31.     Analysis of the sham JFCs' contribution and expenditure reports shows that the JFCs spent at least 4.8 million dollars in specialty account funds on advertisements like these.

32.     The only possible legal justification for those expenditures by the JFCs would be as fundraising expenses for the JFCs, incurred for the purposes of raising funds for the participating committees, including the NRSC's specialty accounts. But these were not legitimate fundraising expenses, because they did not, in fact, raise funds that were distributed to those accounts. Rather, despite raising millions of dollars designated for the NRSC's specialty accounts, the sham JFCs transferred only $8,174 to those accounts.

33.     This means that the rest of those specialty account funds—amounting to multiple millions of dollars—were spent by the sham JFCs on their operating expenses. And each sham JFC reported that over 99% of their "operating expenses" were for media-related costs, totaling $20.07 million. All or most of these funds were spent on the advertisements—SMP is not aware of any other significant media spending by the sham JFCs.

34.    In sum, the NRSC concocted a scheme to (1) raise money through the sham JFCs that could only lawfully be allocated to the NRSC's specialty accounts, and then (2) evade the restrictions on the use of specialty account funds by spending the funds raised on candidate advertising through the JFC, under the pretext of fundraising, instead of distributing the funds to the specialty accounts for which they were purportedly raised.

35.    The NRSC's spending violates the plain text of FECA, which provides that a national party committee's legal proceedings account may only be used to pay for "the preparation for and the conduct of election recounts and contests and other legal proceedings." 52 U.S.C. § 30116(a)(9)(C), and that the headquarters account may only be used "solely to defray expenses incurred with respect to the construction, purchase, renovation, operation, and furnishing of one or more headquarters buildings of the party." *Id.* § 30116(a)(9)(B).

36.    Allowing donations to specialty accounts to finance candidate television advertisements is also irreconcilable with the Act's contribution limits on donations to a national party committee. If a national party committee could use the specialty accounts for candidate television advertising, it would render the general contribution limit to a national party committee and the requirement to keep the specialty accounts "separate" and "segregated" meaningless. A donor could simply give over six times the regular contribution limit to the two specialty accounts to fund candidate advocacy.

37.    Congress established the party committee specialty accounts to make it easier for national parties to fund a very narrow set of expenses, not as a loophole to avoid general account contribution limits.

38.    The NRSC's use of sham JFCs also had the effect of obscuring its fundraising and spending. While JFCs regularly report the identity of their donors and the amounts of their

contributions, the allocation of those funds among the general and specialty accounts of the various JFC members do not get reported until *after* the funds (or what remains of them) are disbursed to the JFC members, including the NRSC. In the 2024 election cycle, those disbursements—and consequent reporting—were not made until *after* the general election. SMP and the general public therefore had no way of knowing how much money the NRSC had available until the election was over. By funneling its advertising spending through JFCs, the NRSC therefore deprived SMP and the public of accurate information about the amount of funding that it has available in its various accounts. Moreover, by using specialty account funds for general account spending, the NRSC has effectively misreported its contributions and expenditures.

39.     SMP thus suffered an informational injury because it had an inaccurate impression of the NRSC's fundraising and expenditures. Although SMP depended on the NRSC's campaign finance disclosures to make its own decisions on raising and spending money, SMP was in fact basing its strategy on inaccurate information. SMP would have considered different ways to allocate its own expenditures if it had known the NRSC's true spending. SMP, for instance, might have chosen to spend more on a top target Senate race if it knew that the NRSC had more resources available for television advertising, while strategically decreasing spending in another, less competitive Senate race where the chance of victory was projected to be lower.

40.     Since the 2024 elections, the NRSC has done nothing to disclaim its use of sham JFCs or to suggest that it will not engage in the same practice as the 2026 election heats up. Just the opposite: the NRSC is already running at least one campaign advertisement in connection with the 2026 Senate election in Texas that is paid for by a joint fundraising committee that includes the NRSC's specialty accounts. If the FEC does not act on SMP's complaint, the NRSC will

continue to use this unlawful maneuver in the 2026 election cycle, compounding SMP's and the public's informational injury for yet another election cycle.

41.    SMP is not merely a bystander to the NRSC's illegal spending. It is a core participant in a competitive political environment in which the NRSC's mission of electing Republican senators is directly at odds with SMP's mission of electing Democratic senators, giving SMP a clear personal stake in challenging the NRSC's unlawful actions. Instead of raising and spending money in an environment where committees on both sides are following the rules, SMP is being forced to compete on a playing field where the NRSC is violating the law to its own advantage. SMP has been and will be required to spend more money in an attempt to level that playing field.

42.    SMP intends to continue spending in the upcoming 2026 Senate elections, but SMP will be unable to devise an informed strategy if FEC inaction allows the NRSC to continue to violate campaign finance law without consequences, and SMP will once again face a competitive disadvantage as a result.

## CAUSE OF ACTION

### Count I: 52 U.S.C. § 30109(a)(8)(A)

43.    Plaintiff repeats and realleges the forgoing paragraphs if set forth fully herein.

44.    On August 13, 2025, SMP, through its president JB Poersch, filed an administrative complaint with the FEC, naming the NRSC as the Respondent and presenting those of the above facts that were available to Plaintiff at the time. *See generally* Ex. 1.

45.    Upon information and belief, the FEC has failed to act on Plaintiff's administrative complaint since SMP filed it 176 days ago, exceeding the 120-day statutory response period.

46.    Defendant's failure to act on Plaintiff's administrative complaint is contrary to law under 52 U.S.C. § 30109(a)(8)(A), which provides Plaintiff a cause of action for "a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed."

## REQUESTED RELIEF

WHEREFORE, Plaintiff requests this Court:

(1) Declare that the FEC's failure to act on Plaintiff's administrative complaint was contrary to law under 52 U.S.C. § 30109(a)(8)(A);

(2) Order the FEC to conform with this declaration within 30 days pursuant to 52 U.S.C. § 30109(a)(8)(C);

(3) Award Plaintiff its costs and reasonable attorneys' fees incurred in this action; and

(4) Grant such other relief as the Court may deem just and proper.


Dated: February 5, 2026                    Respectfully submitted,

                                           /s/ *David R. Fox*
                                           David. R. Fox (D.C. Bar No. 1015031)
                                           dfox@elias.law
                                           **ELIAS LAW GROUP LLP**
                                           250 Massachusetts Ave. NW, Suite 400
                                           Washington, D.C. 20001
                                           Tel: (202) 968-4490